IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| TEMPUR-PEDIC NORTH AMERICA, LLC, *et al.*, § § § | |
| *Plaintiffs*, § § | |
| v. § § | CIVIL ACTION NO. H-17-1068 |
| MATTRESS FIRM, INC., § § § | |
| *Defendant*. § | |

# MATTRESS FIRM, INC.'S MOTION TO EXCLUDE EXPERT TESTIMONY OF CHRISTINE MEYER, Ph.D.

John B. Thomas (*Attorney-in-charge*)
Texas Bar No. 19856150
S.D. Tex. No. 10675

Paul Mitchell
Texas Bar No. 14217920
S.D. Tex. No. 7495

J. Stephen Barrick
Texas Bar No. 00796168
S.D. Tex. No. 22955

Kelsey M. Machado
Texas Bar No. 24078968
S.D. Tex. No. 1358285

HICKS THOMAS LLP
700 Louisiana Street, Suite 2000
Houston, Texas 77002
713-547-9100

***Attorneys for Mattress Firm, Inc.***

**TABLE OF CONTENTS**

I. INTRODUCTION ................................................................................................................ 1

II. MEYER'S EXPERT OPINION ......................................................................................... 3

    A. Context of Meyer's Testimony. ..................................................................................3

    B. Meyer's Damages Opinion. .........................................................................................3

    C. Meyer's Analysis. ........................................................................................................4

III. MEYER'S TESIMONY IS INADMISSIBLE ................................................................... 7

    A. Standard of Review for Admissibility of Expert Testimony. .....................................7

    B. Meyer's Opinion is Irrelevant. .....................................................................................9

    C. Meyer's Opinion is Unreliable. ...................................................................................9

    D. Meyer Disregarded Evidence Disproving Her Conclusions. ....................................13

IV. CONCLUSION ................................................................................................................. 15

## TABLE OF AUTHORITIES

**Cases**

*Black v. Food Lion, Inc.*,
        171 F.3d 308 (5th Cir. 1999) .......................................................................................7

*Curtis v. M&S Petroleum, Inc.*,
        174 F.3d 661 (5th Cir. 1999) .......................................................................................7

*Daubert v. Merrell Dow Pharm., Inc.*,
        509 U.S. 579 (1993)..................................................................................................7, 8

*General Elec. Co. v. Joiner*,
        522 U.S. 136 (1997)..................................................................................................8, 13

*Guile v. United States*,
        422 F.3d 221 (5th Cir. 2005) .......................................................................................8

*Johnson v. Arkema, Inc.*,
        685 F.3d 452 (5th Cir. 2012) ...................................................................................8, 13

*Knight v. Kirby Inland Marine Inc.*,
        482 F.3d 347 (5th Cir. 2007) ....................................................................................7, 8

*Kumho Tire Co. v. Carmichael*,
        526 U.S. 137 (1999)......................................................................................................7

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
        134 S. Ct. 1377 (2014)................................................................................................12

*Munoz v. Orr*,
        200 F.3d 291 (5th Cir. 2000) .....................................................................................11

*Orthoflex, Inc. v. ThermoTek, Inc.*,
        986 F. Supp. 2d 776 (N.D. Tex. 2013) .....................................................................7, 8

*Paz v. Brush Engineered Materials, Inc.*,
        555 F.3d 383 (5th Cir. 2009) .......................................................................................8

*Pipitone v. Biomatrix, Inc.*,
        288 F.3d 239 (5th Cir. 2002) ..............................................................................7, 8, 14

*Seatrax, Inc. v. Sonbeck Int'l, Inc.*,
        200 F.3d 358 (5th Cir. 2000) .......................................................................................7

Case 4:17-cv-01068   Document 106   Filed on 01/19/18 in TXSD   Page 4 of 20

*Tagatz v. Marquette Univ.*,
    861 F.2d 1040 (7th Cir. 1988) ...................................................................................... 11

*United States v. Liu*,
    716 F.3d 159 (5th Cir. 2013) ........................................................................................ 7

*United States v. Valencia*,
    600 F.3d 389 (5th Cir. 2010) ........................................................................................ 9

*Verisign, Inc. v. XYZ.COM LLC*,
    848 F.3d 292 (4th Cir. 2017) .................................................................................. 11, 12

*Viterbo v. Dow Chem. Co.*,
    826 F.2d 420 (5th Cir. 1987) ........................................................................................ 8

*Watkins v. Telsmith, Inc.*,
    121 F.3d 984 (5th Cir. 1997) ........................................................................................ 8

*Xoom, Inc. v. Imageline, Inc.*,
    323 F.3d 279 (4th Cir. 2003) ...................................................................................... 12

**Rules**

FED. R. EVID. 702 ............................................................................................................. 2, 7

Defendant Mattress Firm, Inc. ("Mattress Firm") files this Motion to Exclude Expert Testimony of Christine Meyer, Ph.D. and, in support thereof would respectfully show the Court the following:

## I. INTRODUCTION

This is primarily a Lanham Act trademark infringement case. Plaintiffs Tempur-Pedic North America, LLC ("Tempur-Pedic"), Sealy Mattress Company ("Sealy"), Dan-Foam ApS ("Dan-Foam"), and Sealy Technology LLC ("Sealy Technology") (collectively, "Tempur Sealy")[1] contend that, in various ways, Defendant Mattress Firm, Inc. ("Mattress Firm") infringed their trademarks after the parties' contractual business relationship ended on April 3, 2017. *See* Pls.' 5th Am. Comp. at 9-16 (Dkt. # 101). Among other things, Tempur Sealy complains that Mattress Firm has used or referenced Tempur Sealy's trademarked brand and product names on its website, in advertising the sale of Mattress Firm's remaining inventory of Tempur Sealy products, and in product-comparison ads. *Id*.

Tempur Sealy asserts twelve causes of action against Mattress Firm, including: (1) Lanham Act trademark infringement; (2) Lanham Act unfair competition; (3) Lanham Act trademark dilution; (4) Lanham Act false advertising; (5) & (6) breach of Letter Agreements; (7) Texas statutory trademark dilution and injury to business reputation; (8) common-law trademark infringement; (9) common-law misappropriation; (10) common-law unfair competition; (11) unjust enrichment; and (12) breach of sales contracts. *Id.* at 18-29. On each of its causes of action, Tempur Sealy claims to have sustained, and seeks to recover, actual damages—primarily, damage to its "goodwill, reputation and business interests," and "diminished capacity to compete, diverted business, [and] lost profits both past and future." *Id.* ¶¶ 86, 94, 102, 113, 121, 126, 133, 137, 144, 152, 155, 161, 168 & Prayer item F.

---

[1] Plaintiffs are all owned and controlled by Tempur Sealy International, Inc. (NYSE: TPX). *See* Plaintiffs' Corporate Disclosure Statement at 2 (Dkt. # 9). For simplicity, Plaintiffs are sometimes referred to herein as "Tempur Sealy."

1

To support nearly all of its claims for damages, Tempur Sealy offers the expert testimony of Christine Meyer, Ph.D.—an economist who purports to calculate lost profits sustained by Tempur-Pedic. *See* Pls.' Supp. Ans. to Def.'s Interrogs., No. 8 (Ex. A, pp. 4-5); Expert Rept. of Christine S. Meyer, Ph.D ("Meyer Rept.") at 4-5 (Ex. B). Meyer opines that Tempur-Pedic sustained $13.4 million in lost profits as a result of Mattress Firm's allegedly improper discount advertising of Tempur-Pedic products between March 5, 2017 and May 6, 2017 based on her estimation of the value of an apparent dip in Tempur-Pedic's sales to retailers and consumers during that time period. *See* Meyer Rept. at 14, ¶ 38.

Meyer's opinion is inadmissible under Rule 702 of the Federal Rules of Evidence and must be excluded for three principal reasons. First, her damages testimony is not relevant to any pleaded damages theory in this case. Tempur Sealy's claims are all based on Mattress Firm's alleged improper use of Tempur Sealy's trademarks without authorization, or on alleged false advertising, not on Mattress Firm's purported violation of a contractual prohibition against discount advertising. *See* Pl.'s 5th Am. Compl. ¶¶ 80-155.[2] Second, even if the subject of Meyer's testimony were relevant, there is no evidence of causation, and Meyer offers only conjecture to show that Mattress Firm's discount advertising caused Tempur-Pedic to sustain lost profits. Meyer's analysis is merely an attempt to estimate the dollar value of an apparent anomaly in Tempur-Pedic's sales performance between March 5, 2017 and May 6, 2017. Meyer offers nothing to reliably show that Mattress Firm's discount advertising caused that anomaly; instead, she simply assumes that it did, making her causation testimony speculative and unreliable. Finally, Meyer disregards, without explanation or justification, data proving that her causation analysis is invalid and unreliable. Meyer's testimony is irrelevant, unreliable, and must be excluded under Fed. R. Evid. 702.

---

[2] This is discussed in detail in Mattress Firm, Inc.'s Motion for Summary Judgment on Plaintiffs' Claims for Damages, which is being filed contemporaneously herewith.

2

## II. <u>MEYER'S EXPERT OPINION</u>

A.    **Context of Meyer's Testimony.**

This lawsuit stems from the termination of Mattress Firm's long-term business relationship with Tempur Sealy. On January 27, 2017, after receiving a verbal termination notice from Mattress Firm, Tempur Sealy served written notice that it was terminating the parties' long-term contractual relationship. *See* Pls.' 5th Am. Compl. ¶¶ 26-27 (Dkt. # 101). On January 30, 2017, the parties entered into two Letter Agreements (one with Tempur-Pedic and one with Sealy) in which they agreed that the relationship would essentially continue through April 3, 2017, after which Mattress Firm would no longer be an authorized Tempur Sealy retailer. *Id.* ¶¶ 29-32.

Tempur Sealy sued Mattress Firm on April 7, 2017, complaining that Mattress Firm still had signs and website references with Tempur Sealy's trademarked names and logos on them. *See* Pls.' Orig. Compl. ¶¶ 34-36 (Dkt. # 1). After five amendments of its complaint, Tempur Sealy now asserts twelve causes of action, including trademark infringement, false advertising, and breach of contract. *See* Pls.' 5th Am. Compl. ¶¶ 80-162 (Dkt. # 101). Tempur Sealy's tort and statutory claims are based on the allegation that Mattress Firm has improperly used Tempur Sealy's trademarks after April 3, 2017 without authorization, or that Mattress Firm has published product-comparison ads that contain false information. *Id.* ¶¶ 81, 90-91, 99, 106-09, 129-30, 136, 141, 148-49 & 155. On all but one of its causes of action,[3] Tempur Sealy claims to have sustained damages. *Id.* ¶ 168.

B.    **Meyer's Damages Opinion.**

Tempur Sealy has designated Christine Meyer, Ph.D., as its only expert to testify on causation and damages in this case. *See* Pls.' Supp. Ans. to Def.'s Interrogs., No. 8 (Ex. A, pp. 4-5). Meyer's testimony, however, does not align with any of the claims asserted by Tempur Sealy

---

[3] Tempur Sealy has withdrawn its claim for damages as to Count 4 of its Fifth Amended Complaint.

in this case. The owners of the trademarks that Mattress Firm is alleged to have improperly used are Dan-Foam and Sealy Technologies, *see* Pls.' 5th Am. Compl. ¶ 13, but Meyer offers no opinion about any damage to either of those entities. *See* Meyer Rept. (Ex. B). Meyer also offers no opinion about any damage to Sealy, even though Sealy is similarly situated to Tempur-Pedic as a premium brand-name mattress distributor. *See id.*; Meyer Dep. at 160:2-5 (Ex. C). Instead, Meyer's testimony is limited to Tempur-Pedic, and it is limited to a claim for lost profits allegedly resulting from Mattress Firm's advertising of Tempur-Pedic products for sale at a discount. *See* Meyer Rept. at 5; Meyer Dep. at 90:8-25. Tempur-Pedic maintains that its guidelines prohibited Mattress Firm from advertising its products at a discount without Tempur-Pedic's consent. *See* Meyer Rept. at 9-11.

Meyer is not an expert on sales or marketing in the bedding industry or any other industry. *See* Meyer Dep. at 13:24 – 19:9; Meyer Rept. at 3. She is an economist who offers testimony and analysis that Mattress Firm's publication of discount advertising for Tempur-Pedic products between March 5, 2017 (approximately one month before Mattress Firm's relationship with Tempur Sealy as an authorized retailer ended) and May 6, 2017 (approximately one month after) caused Tempur-Pedic to sustain a $24.6 million reduction in sales during that time period, which allegedly translates into $13.4 million in lost profits. Meyer Rept. at 5, ¶ 9. Meyer suggests that Tempur-Sealy also sustained other long-term harm as a result of Mattress Firm's discount advertising, but she made no attempt to prove or quantify any such damages. *Id.* ¶ 10.

**C.     Meyer's Analysis.**

Meyer's analysis is merely an attempt to quantify the dollar value of an unexplained dip in Tempur-Sealy's sales to non-Mattress Firm retailers and consumers between March 5, 2017 and May 6, 2017. Completely absent from the analysis, however, is any reliable showing of what actually caused the dip in sales.

Meyer first notes that Tempur-Pedic's revenue from sales to non-Mattress Firm retailers and directly to consumers increased an average of 30% in 2017 over 2016, but less so during the "Damages Period" between March 5, 2017 and May 6, 2017. *See* Meyer Rept. at 16-17. Meyer made no attempt to investigate or explain how or why Tempur-Pedic's non-Mattress Firm sales increased so significantly from 2016 to 2017, or why that increase temporarily slowed during the Damages Period. She simply assumed it was an economic injury caused by Mattress Firm's discount advertising and undertook to quantify it.

To quantify the apparent sales anomaly during the Damages Period, Meyer first selected "benchmark" periods in 2017 before and after the Damages Period (January 29, 2017 through March 4, 2017, and May 7, 2017 through September 1, 2017). *Id.* at 15-16. During those months, Tempur-Sealy's non-Mattress Firm sales were roughly 30% higher than the same periods in 2016 (with an "average ratio" of 1.3), but were essentially the same as the year before during the two-month Damages Period. *Id.* at 16-17. Meyer then used that average ratio to calculate how much higher Tempur-Pedic's sales would have been during the Damages Period if that period had experienced the same increase in sales over the year before. *Id.* at 17. That produced a calculation of approximately $24.6 million more in sales to non-Mattress Firm retailers and consumers, which translated to approximately $13.4 million in profits, applying Tempur-Pedic's average gross margin on sales during that time period. *Id.* at 17-18. This, Meyer concluded, it the amount of "lost profits" Tempur-Pedic sustained as a result of Mattress Firm's two months of discount advertising during the Damages Period. *Id.* at 18.

Completely absent from Meyer's analysis is any showing that Mattress Firm's discount advertising was actually responsible for causing the lessening of Tempur-Pedic's year-over-year increase in sales during the Damages Period. *See id.* at 15-18; *see also* Meyer Dep. at 203:18-22 (stating that "the totality of my opinion is set forth in the report," including all evidence supporting causation). Meyer did not conduct any investigation or analysis of Tempur-Pedic's

5

business to understand why its sales to non-Mattress Firm retailers and consumers increased during the benchmark months in 2017 compared to the year before, but not for the Damages Period. Meyer did not conduct or rely upon any surveys or interviews of retailers or consumers to understand why their buying patterns might have changed. She also made no attempt to identify and rule out other potential causes of the apparent anomaly. She simply assumed that because the anomaly generally corresponded to the time period when Mattress Firm was known to have been advertising Tempur-Pedic and Sealy products for sale at discounted prices, that meant that the discounting element of Mattress Firm's advertisements caused the anomaly.[4] *See* Meyer Dep. at 95:12 – 96:2, 98:21 – 99:19, 108:5-9, 136:16 – 138:11.

      Meyer's analysis is also curiously silent about Sealy. Sealy is also a plaintiff, is similarly situated to Tempur-Pedic in almost every way, and has asserted all the same causes of action against Mattress Firm. The same discount advertising that Meyer claims was responsible for causing a $24.6 million loss in sales to Tempur-Pedic also advertised Sealy products at a discount. See Meyer Dep. at 146:22 – 147:24. Yet, Meyer has nothing to say about Sealy's lost profit, and that is because if the same analysis is applied to Sealy, it shows that Sealy's profitability *increased* during the so-called Damages Period. *See* Solomon Aff. ¶ 5 (Ex. D). The Sealy data undermines Meyer's lost profits theory with regard to Tempur-Pedic because if that theory were valid, it would show a loss of profits to Sealy as well. But it does not, and Meyer cannot explain why. She simply disregards it because it contradicts her analysis.

---

[4] The *discounting* part of Mattress Firm's advertisements is the only thing Meyer presumed to be wrongful. In fact, Mattress Firm was entitled to advertise its inventory of Tempur-Pedic and Sealy products for sale and was still an authorized retailer of those products until April 3, 2017. *See* Def.'s Mot. for Summ. J. on Pls.' Claim for Breach of Ltr. Agrs. at 5-6, 9-10 (Dkt. # 105); Def.'s Mot. for Summ. J. on Pls.' Extra-Contractual Claims at 7-8 (filed concurrently herewith).

### III. <u>MEYER'S TESIMONY IS INADMISSIBLE</u>

**A.    Standard of Review for Admissibility of Expert Testimony.**

The admissibility of expert testimony is governed by Fed. R. Evid. 702, which states: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." FED. R. EVID. 702. Rule 702 and the principles in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 590-93 (1993), apply to any technical or specialized expert testimony. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999); *Black v. Food Lion, Inc.*, 171 F.3d 308, 310 (5th Cir. 1999).

This Court decides motions to exclude expert testimony in its role as gatekeeper under Rule 702. *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002); *Seatrax, Inc. v. Sonbeck Int'l, Inc.*, 200 F.3d 358, 371 (5th Cir. 2000). "The court may admit proffered expert testimony only if the proponent, who bears the burden of proof, demonstrates that (1) the expert is qualified, (2) the evidence is relevant to the suit, and (3) the evidence is reliable." *Orthoflex, Inc. v. ThermoTek, Inc.*, 986 F. Supp. 2d 776, 782 (N.D. Tex. 2013) (citing *Kumho Tire*, 526 U.S. at 147); *see also United States v. Liu*, 716 F.3d 159, 167 (5th Cir. 2013) (holding expert testimony must be relevant and reliable to be admissible).

To be relevant, "expert testimony [must] 'assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Pipitone*, 288 F.3d at 245. "Relevance depends upon whether [the expert's] reasoning or methodology properly can be applied to the facts in issue." *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 352 (5th Cir. 2007) (quoting *Daubert*, 509 U.S. at 593); *see also Curtis v. M&S Petroleum, Inc.*, 174 F.3d 661, 668 (5th Cir. 1999) (same).

Fundamentally unsupported expert testimony does not assist the jury and should be excluded. *Guile v. United States*, 422 F.3d 221, 227 (5th Cir. 2005) (citing *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987)).

"Reliability is determined by assessing 'whether the reasoning or methodology underlying the testimony is scientifically valid.'" *Knight*, 482 F.3d at 352 (quoting *Daubert*, 509 U.S. at 592-93). Expert testimony "must constitute 'more than subjective belief or unsupported speculation.'" *Paz v. Brush Engineered Materials, Inc.*, 555 F.3d 383, 388 (5th Cir. 2009) (quoting *Daubert*, 509 U.S. at 590). The court focuses on the expert's methodology, not the conclusions generated by it. *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 989 (5th Cir. 1997); *Orthoflex*, 986 F. Supp. 2d at 783.

Expert testimony "must be reliable at each and every step or else it is inadmissible. The reliability analysis applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, [and] the link between the facts and the conclusion." *Knight*, 482 F.3d at 355. "Where the expert's opinion is based on insufficient information, the analysis is unreliable." *Paz*, 555 F.3d at 388. If "there is simply too great an analytical gap between the [basis for the expert opinion] and the opinion proffered," the court may exclude the testimony as unreliable. *Johnson v. Arkema, Inc.*, 685 F.3d 452, 460-61 (5th Cir. 2012) (quoting *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).

Five non-exclusive factors are generally used to aid in determining whether an expert's methodology is reliable are: (1) whether the expert's technique can be or has been tested; (2) whether the method has been subjected to peer review and publication; (3) the known or potential rate of error of a technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) the degree to which the technique or theory has been generally accepted in the scientific community. *Pipitone*, 288 F.3d at 244 (citing *Daubert*, 509 U.S. at 593-94). Not all factors will necessarily apply to every expert's testimony. *Watkins*, 121 F.3d at 990-

91. "The relevance and reliability of expert testimony turns upon its nature and the purpose for which its proponent offers it." *United States v. Valencia*, 600 F.3d 389, 424 (5th Cir. 2010).

**B.     Meyer's Opinion is Irrelevant.**

As discussed above, Tempur-Pedic has not asserted any claim against Mattress Firm for breach of its advertising guidelines. Instead, Tempur Sealy's breach-of-contract claims are based Mattress Firm's alleged "unauthorized use" of Tempur-Pedic's protected trademarks; it alleged failure to "confirm in writing" the cessation of such uses; and it alleged failure to fully pay for goods sold. *See* Pls.' 5th Am. Compl. ¶¶ 115-121, 156-162 (Dkt. # 101). Therefore, Meyer's opinion testimony is not relevant to any claim or issue that is properly before this Court and must be excluded as irrelevant.

**C.     Meyer's Opinion is Unreliable.**

Meyer's opinion that Mattress Firm's discount advertising caused Tempur-Pedic to sustain $13.4 million in lost profits is unreliable and inadmissible. Her report merely estimates the dollar value of an apparent two-month anomaly in Tempur-Pedic's sales trend, which is not relevant to any claim or issue. Her causation analysis is also completely unreliable because it is based on nothing more than a temporal correlation. Thus, Meyer's opinion will not assist the trier of fact to determine any fact in issue and must be excluded.

In her deposition, Meyer confirms that the "totality" of her opinion and analysis is set forth in her expert report. Meyer Dep. at 203:18-22. She begins her analysis in conventional fashion, stating that her report estimates the amount of Tempur-Pedic's lost profits by calculating the difference between the amount of profits Tempur-Pedic would have received "but for the damaging act" and the profits Tempur-Pedic actually obtained during the relevant time period. *See* Meyer Rept. at 14 (citing the *Reference Manual on Scientific Evidence*). But, as Meyer admits, the first step in performing that analysis is to "isolate the loss of value caused by the

9

harmful act and exclude any change in the plaintiff's value arising from other sources," *id.*, which she never did.

Instead of isolating the effects (if any) of Mattress Firm's discount advertising and excluding other possible causes, Meyer simply *assumed* that the two-month decrease in the amount by which Tempur-Pedic's sales to non-Mattress Firm retailers and consumers increased was caused by Mattress Firm's discount advertising because they occurred at roughly the same time. Meyer conducted no investigation or analysis to understand precisely why Tempur-Pedic's sales were up 30% in 2017 compared to 2016; no investigation of industry advertising practices at that time to understand how Mattress Firm's advertisements might have been received; and no investigation or analysis of why Tempur-Pedic's increase in sales in 2017 was not as pronounced during the Damages Period as it was in the months before and after that period. *See* Meyer Dep. at 34:15 – 38:21, 92:18 – 93:6, 95:12 – 96:2. Meyer also conducted no consumer surveys and spoke to none of Tempur-Pedic's customers to understand why their purchasing patterns might have changed. *Id.* at 95:18 – 98:17. Yet, despite the complete absence of any empirical data, Meyer concludes that "but for" Mattress Firm's discount advertising, Tempur-Pedic's sales to non-Mattress Firm retailers and consumers between March 5, 2017 and May 7, 2017 would have been approximately 30% higher than such sales were in 2016, and that the discounting element of Mattress Firm's advertisements during that time was responsible for 100% of the difference. Meyer Rept. at 5; Meyer Dep. at 186:10-23, 189:2-11.

Meyer's opinion that Mattress Firm's discount advertising caused a two-month dip in sales in 2017 is based on nothing more than a temporal correlation. After acknowledging that she spoke to none of Tempur-Pedic's customers to understand why their buying pattern may have changed, Meyer testified:

> Q. Wouldn't you have wanted to ask specific retailers, assuming for the moment that in fact they were ordering less from Tempur-Sealy, wouldn't you have wanted to speak with them and find out the reason?

10

> A. I think the data speaks for itself in terms of the reduction in volumes sold to other retailers. I did not − I do not typically in these sort of situations call specific retailers and I certainly didn't feel the need to do so here.
>
> Q. So instead of checking with specific retailers as to specifically why they did not purchase additional product, you simply assumed that the reason they did not purchase additional product must have been the Mattress Firm advertisements that ran between March 5 and May 6 of 2017?
>
> A. As my analysis shows, there was a marked decrease in sales to other retailers and also in the direct consumer part of Tempur-Pedic's business and it corresponded quite clearly to the period of time in which Mattress Firm was doing its advertising, and to me that is consistent − completely consistent with the notion that it was the advertising that was driving those particular reductions.

Meyer Dep. at 98:21 – 99:19; *see also id.* at 95:12 – 96:2, 108:5-9, 137:16 – 138:11 (confirming that she relied on temporal correlation and year-over-year sales figures).

Meyer relies entirely on statistics to show that Mattress Firm's discount advertising caused a decrease in sales and profits, but as the Fifth Circuit has explained, "statistics can show only correlation and not causation." *Munoz v. Orr*, 200 F.3d 291, 301 (5th Cir. 2000) (citing *Tagatz v. Marquette Univ.,* 861 F.2d 1040, 1044 (7th Cir. 1988)). Relying on a statistical correlation to show Lanham Act damages is, as the Fourth Circuit recently explained, a "fatal flaw" in the analysis requiring exclusion of the expert. *Verisign, Inc. v. XYZ.COM LLC*, 848 F.3d 292, 300-01 (4th Cir. 2017).

The *Verisign* decision is directly on point. In *Verisign*, an internet domain name registrar sued a competitor for false advertising in violation of Section 43(a) of the Lanham Act, claiming the competitor's advertisements touting the popularity of its ".xyz" domain while emphasizing the scarcity of the ".com" domain were misleading and caused the plaintiff to sustain lost profits from domain name registrations. *Id.* at 295. To support its claim for lost profits, the plaintiff offered expert testimony finding the plaintiff sustained $527,000 in lost profits due to redirected domain name registrations. *Id.* at 300. The expert reached this conclusion by: (a) identifying a decline in registrations of the plaintiff's ".net" domain during the time period that the offending

11

ads ran; (b) attributing a percentage of those "lost registrations" to the defendant, based on its market share of new registrations; and (c) multiplying that percentage by the amount she found would have been the plaintiff's profits on the lost registrations. *Id.*

Exercising its gatekeeping function under *Daubert*, the district court excluded the expert's report and granted summary judgment for the defendant, finding the expert's methodology was "questionable," and that her conclusions were "not reliable," because her "analysis failed to distinguish between 'correlation' and 'causation.'" *Id.* On appeal, the court agreed and affirmed the summary judgment, explaining:

> [The expert's] analysis suffers from what we have identified as a "fatal flaw" in calculating Lanham Act damages: It assumes rather than demonstrates that every .xyz registration during the relevant time period was the result of [the defendant's] allegedly false statements. *See PBM Products*, 639 F.3d at 122 ("The fatal flaw in [plaintiff's] economic information was that its expert assumed that every sale [defendant] made was attributable to the [allegedly false statement]."). [The expert's] report does show that [plaintiff] experienced a drop in .net registrations after .xyz – along with other new top-level domains – became available, and while [defendant] was making the statements of which [plaintiff] complains. What it does not show, however, is anything other than a temporal link between [defendant's] statements and the drop-off in .net registrations – a "correlation," in the district court's words, but not "causation." . . . And that is not enough under the Lanham Act, where the plaintiff bears the burden of proving a "causal link between actual damages and [the defendant's] actions."

*Id.* at 300-01 (citing *Xoom, Inc. v. Imageline, Inc.*, 323 F.3d 279, 286 (4th Cir. 2003) and *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1391 (2014)).

Meyer's analysis here is indistinguishable from the excluded analysis in *Verisign*, and suffers from the same fatal flaw. Like the expert in *Verisign*, Meyer simply identified a decline in Tempur-Pedic's sales during the time period that Mattress Firm's discount advertisements ran, calculated a dollar value for that decline, and declared that amount to be Tempur-Pedic's lost profits. *See* Meyer Rept. at 16-18. Like the expert in *Verisign*, Meyer conflates "correlation" and "causation" and inappropriately *assumes* that because Mattress Firm's discount advertising occurred during the same general time period as the purported reduction in Tempur-Pedic's year-

12

over-year increase in sales, that means not only that Mattress Firm's advertising caused the reduction but that the discounting element of those advertisements caused it. *See* Meyer Dep. at 95:12 – 96:2, 98:21 – 99:19, 108:5-9, 137:16 – 138:11 (relying on temporal correlation). Meyer's conclusion does not logically follow from the data she upon which she relies, and is therefore unreliable and inadmissible. *Joiner*, 522 U.S. at 146; *Johnson*, 685 F.3d at 460-61.

In a superficial attempt to give her opinion the appearance of validity, Meyer *asserts* that she ruled out other possible causes of the decrease in Tempur-Pedic's non-Mattress Firm sales during the Damages Period. *See* Meyer Rept. at 18; Meyer Dep. at 150:8 – 151:17. But she fails to describe what she did to identify and rule out other causes, or explain how it actually rules out other possible causes. To the contrary, Meyer testified that "there's not an ability to specifically isolate one effect from the other, which is why I focus as I did on the year-upon-year sales and focus on the benchmark periods for the other retailers." Meyer Dep. at 108:5-9. Tempur Sealy and Meyer offer nothing but Meyer's word that she did, in fact, isolate the effects of Mattress Firm's discount advertising campaign and rule out other causes, and the law is clear that an expert's opinion cannot be shown reliable based only on the *ipse dixit* of the expert. *Joiner*, 522 U.S. at 147. Tempur Sealy has the burden of proof to demonstrate a reliable basis for Meyer's conclusions and has utterly failed to do so.

### D.     Meyer Disregarded Evidence Disproving Her Conclusions.

Not only is Meyer's causation analysis unreliable on its face, it also conveniently ignores evidence proving its unreliability. Conspicuously absent from Meyer's report is any opinion about *Sealy's* lost profits. *See* Meyer Rept. at 5. But Sealy and Tempur-Pedic are similarly situated in virtually every way. Both are plaintiffs in this case; both distribute and sell mattresses and other products through authorized retailers; both entered into substantially identical agreements with Mattress Firm that ended at the same time, and in the same manner; both hold themselves out as premium brands; both claim to have advertising guidelines that prohibit

discount advertising; and both assert the same causes of action against Mattress Firm, based on the same underlying facts, through the same counsel. And many, if not most, of the discount advertisements that Meyer bases her opinion on also refer to Sealy. *See* Meyer Dep. at 144:1-23, 147:7-13. Thus, one would expect Sealy to have the same lost profits damages claim as Tempur-Pedic.

Yet, even though Meyer admittedly performed a similar damages analysis for Sealy prior to issuing her expert report, she offers no opinion about Sealy's damages. Meyer Dep. at 160:2-5, 189:21-23, 191:3. That is because if the methodology and analysis that Meyer applied to Tempur-Pedic is applied to Sealy, the result is not only that Sealy suffered no damages but that it actually *profited* as a result of Mattress Firm's discount advertising. Using the same type of data for the same time periods, and applying the same methodology and calculations, the Sealy data shows that for the "Damages Period" of March 5, 2017 through May 6, 2017, Sealy's sales actually *increased* by approximately $11.2 million. *See* Solomon Aff. ¶ 5 (Ex. D); *see also* Meyer Dep. at 160-176, 186 (discussing same and agreeing that it applies the same methodology).

The Sealy data clearly undermines the validity of Meyer's calculation of Tempur-Pedic's lost profits. A key facts in evaluating whether an expert's methodology is reliable is whether it can be tested and confirmed, *Pipitone*, 288 F.3d at 244, and a test of Meyer's methodology by applying it to the Sealy data proves that Meyer's methodology is invalid. Meyer obviously knew her approach was invalid because she admits she ran her own calculations for Sealy and chose not to use them. *See* Meyer Dep. at 189:15-23, 190:16 – 191:6.[5] Yet, Meyer made no effort to investigate the inconsistency or explain why it does not conclusively disprove the validity her

---

[5] Meyer conveniently could not recall what her analysis of the Sealy data actually showed. *See* Meyer Dep. at 191:16-17. But, when confronted with the inconsistency, she did not deny that her results were the same, and she offered rank speculation that Sealy was somehow "able to overcome the damage that was caused it by Mattress Firm's discount advertising," but Tempur-Pedic, inexplicably, was not. *Id.* at 187:5-13.

opinion. *See id.* at 191:24 – 192:10. For this additional reason, Meyer's opinion is unreliable and must be excluded under Rule 702 and *Daubert*.

## IV. **CONCLUSION**

For all of the foregoing reasons, Mattress Firm requests that Tempur Sealy's designation of Christine Meyer as an expert be stricken, and that her testimony be excluded from evidence in this case for all purposes.

Respectfully submitted,

HICKS THOMAS LLP

*/s/ John B. Thomas*
John B. Thomas (*Attorney-in-charge*)
Texas Bar No. 19856150
S.D. Tex. No. 10675
jthomas@hicks-thomas.com

Paul Mitchell
Texas Bar No. 14217920
S.D. Tex. No. 7495
pmitchell@hicks-thomas.com

J. Stephen Barrick
Texas Bar No. 00796168
S.D. Tex. No. 22955
sbarrick@hicks-thomas.com

Kelsey M. Machado
Texas Bar No. 24078968
S.D. Tex. No. 1358285
kmachado@hicks-thomas.com

700 Louisiana Street, Ste. 2000
Houston, Texas 77002
Tel.: (713) 547-9100
Fax: (713) 547-9150

ATTORNEYS FOR DEFENDANT
MATTRESS FIRM, INC.

## **CERTIFICATE OF SERVICE**

Service of this document on all counsel of record was accomplished automatically through the Court's Notice of Electronic Filing.

<div style="text-align: right;">*/s/ John B. Thomas*</div>