# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| TEMPUR-PEDIC NORTH AMERICA, LLC, SEALY MATTRESS COMPANY, DAN-FOAM APS, and SEALY TECHNOLOGY LLC, | § § § § § | CIVIL ACTION NO. 4:17-CV-1068 |
| Plaintiffs, | § § | |
| v. | § § | **JURY DEMANDED** |
| MATTRESS FIRM, INC., | § § | |
| Defendant. | § § | |

**PLAINTIFFS' COMBINED OPPOSITION TO DEFENDANT'S MOTIONS TO
EXCLUDE EXPERT TESTIMONY OF CHRISTINE MEYER, PH.D. AND
FOR SUMMARY JUDGMENT ON PLAINTIFFS' CLAIMS FOR DAMAGES**

Robert J. Carty, Jr., Attorney-in-Charge
Texas Bar No. 00788794
S.D. Texas I.D. No. 22790
Jesse M. Coleman
Texas Bar No. 24072044
S.D. Texas I.D. No. 1101514
John P. Phillips
Texas Bar No. 24083659
S.D. Texas I.D. No. 1691762
SEYFARTH SHAW LLP
700 Milam Street, Suite 1400
Houston, Texas 77002
713-225-2300 (Telephone)
Email: rcarty@seyfarth.com
jmcoleman@seyfarth.com
jphillips@seyfarth.com

William N. Berkowitz (admitted *pro hac vice*)
Brandon L. Bigelow (admitted *pro hac vice*)
William F. Benson (admitted *pro hac vice*)
SEYFARTH SHAW LLP
Two Seaport Lane, Suite 300
Boston, Massachusetts 02210
617-946-4800 (Telephone)
Email: wberkowitz@seyfarth.com
bbigelow@seyfarth.com
wbenson@seyfarth.com

Dated: February 9, 2018

# **TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................ 1

II.     NATURE AND STAGE OF PROCEEDINGS .................................................. 2

III.    STATEMENT OF ISSUES AND STANDARD OF REVIEW ......................... 2

IV.     FACTUAL BACKGROUND ............................................................................. 3

V.      TEMPUR-SEALY'S FIFTH AMENDED VERIFIED COMPLAINT ............. 5

VI.     DR. MEYER'S QUALIFICATIONS AND ANALYSIS .................................. 6

     A.      Dr. Meyer's Qualifications ................................................................... 6

     B.      Dr. Meyer's Analysis ........................................................................... 7

VII.    ARGUMENT ..................................................................................................... 9

     A.      Mattress Firm's Motion For Summary Judgment On Plaintiff's Damages
              Claim Should Be Denied. ..................................................................... 9

     B.      Mattress Firm's Motion to Exclude Dr. Meyer Should Be Denied. .................... 12

          1.      Dr. Meyer's proffered testimony is relevant. ............................................. 13

          2.      Dr. Meyer's proffered testimony is reliable. ............................................. 13

               a.      It is undisputed that Dr. Meyer is well qualified. ......................... 13

               b.      Dr. Meyer used a generally-accepted methodology for
                        determining causation and economic damages. ........................... 14

          3.      Unlike Tempur-Pedic, Sealy is not a high-end, "no-discount"
               brand. ................................................................................................. 17

VIII.   CONCLUSION .................................................................................................. 18

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ariwodo v. U.S. Customs & Immigration Enforcement*,
  72 Fed. R. Evid. Serv. 560, 2007 WL 580845 at *4 (S.D. Tex. 2007)....................................15

*Ashcroft v. Iqbal*,
  556 U.S. 662, 129 S.Ct. 1937 (2009).....................................................................................11

*Ashe v. Corley*,
  992 F.2d 540 (5th Cir. 1993) ...................................................................................................3

*Austin v. Kroger Texas, L.P.*,
  864 F.3d 326 (5th Cir. 2017) ...................................................................................................3

*Barclay v. Lloyds*,
  No. 4:14-cv-03649, 2016 WL 164113 (S. D. Tex. Jan. 14, 2016)...................................13, 17

*Cardiac Pacemakers, Inc. v. Aspen II Holding Co., Inc.*,
  No. 0:04-cv-04048, 2006 WL 1071886 (D. Minn. 2006).......................................................14

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)..................................................................................................................2

*Daubert v. Merrell Dow Pharm., Inc.*,
  509 U.S. 579, 113 S. Ct. 2786 (1993)................................................................................3, 12

*Envt'l Conservation Org. v. City of Dallas*,
  529 F.3d 519 (5th Cir. 2008) ...................................................................................................3

*Floorgraphics, Inc. v. News America Marking In-Store Services, Inc.*,
  546 F.Supp.2d 155 (D. N.J. 2008) .........................................................................................14

*Fordoche, Inc. v. Texaco, Inc.*,
  463 F.3d 388 (5th Cir. 2006) ...................................................................................................2

*Fret v. Melton Truck Lines, Inc.*,
  706 F. App'x. 824 (5th Cir. 2017) ...........................................................................................3

*Galindo v. Precision Am. Corp.*,
  754 F.2d 1212 (5th Cir. 1985) .................................................................................................2

*Gossett v. Du–Ra–Kel Corp.*,
  569 F.2d 869 (5th Cir. 1978) ...................................................................................................2

*Heatransfer Corp. v. Volkswagenwerk A.G.*,
No. 72-H-1429, 1975 WL 894 (S.D. Tex. 1975) ....................................................14

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137, 119 S. Ct. 1167 (1999) ..................................................................12

*In re Live Concert Antitrust Litigation*,
247 F.R.D. 98 (C.D. Cal. 2007) ..........................................................................14

*Merritt Hawkins & Associates, LLC v. Gresham*,
79 F. Supp. 3d 625 (N.D. Tex. 2015) ...................................................................12

*Montoya v. FedEx Ground Package System, Inc.*,
614 F.3d 145 (5th Cir. 2010) ...............................................................................11

*PPD Enterprises, LLC v. Stryker Corp.*,
4:16-cv-00507, 2017 WL 4950064 (S.D. Tex. Nov. 1, 2017) ...............................12

*Pipitone v. Biomatrix, Inc.*,
288 F.3d 239 (5th Cir. 2002) ........................................................................17, 19

*Taylor v. U.S. Bank Nat'l Ass'n*,
No. H–12–3550, 2015 WL 507526 (S.D. Tex. Feb. 6, 2015)................................15

*United States v. 14.38 Acres of Land*,
80 F.3d 1074 (5th Cir. 1996) ....................................................................15, 17, 19

*Verisign, Inc. v. XYZ.COM, LLC*,
No. 1:14-cv-01749, 2015 WL 7430016 (E.D. Va. Nov. 20, 2015) ........................16

*Verisign, Inc. v. XYZ.COM, LLC*,
848 F.3d 292 (2017)...............................................................................16, 17

## Other Authorities

Fed. R. Civ. P. 56(a) ...............................................................................................2

Fed. R. Civ. P. 56(e) ...............................................................................................3

Fed. R. Evid. 403(a)............................................................................................12, 13

Fed. R. Evid. 702 .......................................................................................... *passim*

K. Kowalski and M. Kuga, *Measuring Commercial Damages via Lost Profits or
Loss of Business Value: Are These Measures Redundant or Distinguishable?*
18.............................................................................................................................14

R. Blair and W. Page, *Speculative Antitrust Damages*, 70 Wash. L. Rev. 443
(1995).......................................................................................................................14

iii

# I.    <u>INTRODUCTION</u>

Defendant, Mattress Firm, Inc. ("Mattress Firm"), seeks to prevent plaintiff, Tempur-Pedic North America, LLC ("Tempur-Pedic"), from proceeding with its damages claim at trial, asserting that (1) Tempur-Pedic never alleged that Mattress Firm violated its advertising requirements and (2) Tempur-Pedic's evidence of lost profits, set forth in the expert reports of Christine Meyer, Ph.D., is unreliable and inadmissible under Fed. R. Evid. 702. (ECF 106-107). Both positions fail.

Mattress Firm's first contention is not only demonstrably untrue—Tempur-Sealy's complaint contains the very allegations Mattress Firm claims do not exist—but it contradicts the position Mattress Firm itself has taken in this case. It also contradicts the findings this Court made in denying Tempur-Sealy's motion for temporary restraining order. Yet, Mattress Firm, despite its own position and this Court's express findings, now claims that Tempur-Pedic never made such an allegation. That contention is wrong and should be rejected.

Mattress Firm's second contention also fails. Tempur-Pedic's expert witness, Dr. Christine Meyer, has now quantified the harm caused by Mattress Firm's discount advertising campaign. Those opinions are admissible because (a) Dr. Meyer's qualifications have not been challenged, (b) her methodology for determining causation and damages is commonly accepted by economists and courts, and (c) as shown below, her opinions and analysis are logical and reliable within the meaning of Fed. R. Evid. 702. All of Mattress Firm's attacks on Dr. Meyer's opinions go strictly to the weight they should be given by the jury, not to their admissibility. Accordingly, because Tempur-Pedic has admissible evidence that Mattress Firm's discount advertising campaign caused actual damages, Mattress Firm's motions seeking to exclude Dr. Meyer and for summary judgment on damages must be denied.

## II.    NATURE AND STAGE OF PROCEEDINGS

As set forth in its Fifth Amended Verified Complaint, Tempur-Pedic contends that Mattress Firm breached the January 30, 2017 Letter Agreement and the Lanham Act by, among other things, launching a multi-million dollar discount advertising campaign, which cheapened Tempur-Pedic's premium brand image and caused actual damage.  (ECF 102, ¶¶ 39-42, and Counts II, III and V). On October 18, 2017, Tempur-Pedic served the Expert Report of Christine S. Meyer, Ph.D. and, on January 26, 2018, served the Rebuttal Expert Report of Christine S. Meyer, Ph.D., which reports conclude that but for Mattress Firm's discount advertising campaign, Tempur-Pedic would have sold substantially more mattresses than it did between March and early May 2017, resulting in lost profits in excess of $13 million.

On January 19, 2018, Mattress Firm filed two related motions:  one seeking to exclude the testimony of Dr. Meyer (ECF 106) and the other seeking summary judgment on Plaintiffs' claims for damages.  (ECF 107).  This brief responds to both motions.

## III.    STATEMENT OF ISSUES AND STANDARD OF REVIEW

Issue 1:  should the Court grant summary judgment in favor of Mattress Firm on Plaintiffs' claims for damages even though plaintiffs properly alleged that Mattress Firm violated Tempur-Pedic's advertising requirements?  Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is genuinely in dispute "if a reasonable jury could return a verdict for the nonmoving party."  *Fordoche, Inc. v. Texaco, Inc.*, 463 F.3d 388, 392 (5th Cir. 2006).  The moving party bears the initial burden of demonstrating the absence of a genuine issue of fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The moving party cannot not meet its burden based on "bald assertions of ultimate facts."  *Gossett v. Du–Ra–Kel Corp.*, 569 F.2d 869, 872 (5th Cir. 1978); *see also Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1221 (5th Cir. 1985).

2

Merely stating that the non-moving party has "no evidence" to support its claim, without pointing to a specific element of that claim, is not enough to shift the burden to the non-moving party. *Fret v. Melton Truck Lines, Inc.*, 706 F. App'x 824, 828 (5th Cir. 2017) ("A mere conclusory statement that the other side has no evidence is not enough to satisfy a movant's burden."); *Ashe v. Corley*, 992 F.2d 540, 543 (5th Cir. 1993). Rather, a party moving for summary judgment based on a purported absence of evidence must show that "there is no evidence to support a *specific element* of the nonmovant's claim." *Austin v. Kroger Texas, L.P.*, 864 F.3d 326, 335 n.10 (5th Cir. 2017) (emphasis in original). It is only if the moving party meets its initial burden that the burden then shifts to the non-moving party to set forth specific facts showing a genuine issue for trial. Fed. R. Civ. P. 56(e). The court must view the evidence in the light most favorable to the non-movant and draw all justifiable inferences in favor of the non-movant. *Envt'l Conservation Org. v. City of Dallas*, 529 F.3d 519, 524 (5th Cir. 2008).

Issue 2: whether Dr. Meyer's proffered expert opinion and testimony is relevant and reliable under Fed. R. Evid. 702, given that Dr. Meyer utilized a generrnaly-accepted approach for determining causation and calculating damages? In evaluating an expert's testimony under Rule 702, the court takes on a "gatekeeping role" and makes a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592-93, 597, 113 S. Ct. 2786 (1993). To admit an expert's testimony, the court must determine that it is both relevant and reliable. *Id.* at 589.

## IV.    FACTUAL BACKGROUND

On January 30, 2017, Plaintiff Tempur-Pedic North America LLC ("Tempur-Pedic") entered into a Letter Agreement (the "Letter Agreement") with Defendant Mattress Firm, Inc. ("Mattress Firm") for the wind-down and termination of the parties' business relationship. Among

other things, the Letter Agreement required Mattress Firm to comply with Tempur-Pedic's "Advertising, Website, and Digital Marketing Requirements," incorporated by reference in the Letter Agreement ("Ad Requirements"). Among other things, the Ad Requirements prohibit retailers from advertising Tempur-Pedic products at prices below Tempur-Pedic's suggested retail prices ("Discount Advertising").[1]

Rather than use the time between January 30 and April 3 to wind down its business relationship with Tempur-Pedic, Mattress Firm instead secretly planned to violate its contractual obligations by launching an unprecedented, "Once in a Lifetime," $40 million ad campaign, featuring Tempur-Pedic's products at heavily-discounted, "70% off" prices (the "Once-in-a-Lifetime Campaign"). (Deposition of Sicily Dickenson at 10:14-20; 46:10-12; 73:16-118:2; App. Ex. F). Mattress Firm did not seek or obtain approval from Tempur-Pedic to use the Tempur-Pedic name or marks in the Once-in-a-Lifetime Campaign. (*Id.* at 133:21-135:2).

The Once-in-a-Lifetime Campaign caused consumers to flock to Mattress Firm for "once in a lifetime" prices, leaving other Tempur-Pedic retailers ("Other Retailers") high and dry. (Deposition of  Richard Anderson at 157:16-158:20; App., Ex. G). Those Other Retailers—themselves bound by Tempur-Pedic's prohibition of Discount Advertising—gave Tempur-Pedic an earful about Mattress-Firm's unauthorized Discount Advertising, and swiftly and substantially reduced their purchases and promotion of Tempur-Pedic products. (*Id.* at 158:21-160:5). Their reduced purchases resulted in lost profits for Tempur-Pedic. (*Id.* at 157:16-158:20; 169:6-170:22;

---

[1] Paragraph 2 of the Letter Agreement incorporated by reference Paragraph 15 of the Tempur-Pedic Master Retailer Agreement, which in turn required Mattress Firm to comply with Tempur-Pedic's Ad Requirements. Copies of the Letter Agreement, Master Retailer Agreement and Ad Requirements are included in Tempur-Sealy's Appendix ("App.") as Exhibits C, D, and E. The prohibition on Discount Advertising set forth in the Ad Requirements excluded advertising of certain floor model (open and used) mattresses and discontinued models, neither of which exclusion is applicable here.

*see also* Expert Report of Christine S. Meyer, Ph.D. ("Meyer Report") and Rebuttal Expert Report of Christine S. Meyer Ph.D. ("Meyer Rebuttal Report"); App., Exs. A and B).  Tempur-Pedic's expert witness, economist Christine S. Meyer, Ph.D., has determined that Mattress Firm's Once-in-a-Lifetime Campaign caused Tempur-Pedic to lose $24.6 million in sales and $13.4 million in profits during the Spring of 2017.  (*Id.*)

## V.    TEMPUR-SEALY'S FIFTH AMENDED VERIFIED COMPLAINT

Even a cursory review of Tempur-Sealy's complaint conclusively refutes Mattress Firm's first contention—i.e., that Tempur-Sealy never alleged that Mattress Firm violated its advertising guidelines.  The Fifth Amended Verified Complaint contains the following allegations:

- Mattress Firm has initiated a new advertising campaign focused on selling Tempur-Pedic and Sealy products in its inventory.  The campaign promotes a "once in a lifetime" opportunity to save "70%" off famous name brands such as Tempur-Pedic and Sealy.

- Mattress Firm's unauthorized use of the Tempur-Sealy Marks is a willful breach of its promises under the Letter Agreements, undertaken in bad faith, and likely to cause customers to believe that Mattress Firm continues to be an authorized retailer of Tempur-Pedic and Sealy products, causing substantial and irreparable harm to Tempur-Sealy and its actual, authorized retailers.  Further, on information and belief, Mattress Firm intends to use the Tempur-Sealy Marks to induce consumers to visit their stores, in the hope of switching them to other products offered by Mattress Firm.

- The vast majority of infringing material feature Tempur-Sealy product being discounted or as clearance items.  Mattress Firm promised in Section 15 of the Master Retailer Agreements that it would abide by the advertising requirements issued by Tempur and Sealy for retailers using the Tempur-Sealy Marks.  Those guidelines expressly forbid the use of discount advertising because it cheapens Tempur-Sealy's premium brand image.  Mattress Firm's advertising undermines the significant investment Tempur-Sealy made to promote that image, and is unfair to retailers who do abide by the advertising requirements issued by Tempur and Sealy for retailers using the Tempur-Sealy Marks.

- Mattress Firm's continued unauthorized use of Tempur-Sealy's intellectual property will negatively impact the over 12,000 stores that are authorized, unlike Mattress Firm, to utilize Tempur-Sealy's trademarks and trade names.  If Mattress Firm continues to advertise and otherwise promote the Tempur-Sealy brand,

Tempur-Sealy authorized retailers are likely to lose business that they otherwise would have obtained.

Fifth Amended Verified Complaint (ECF No. 102), ¶¶ 39-42. Those allegations were incorporated by reference in each of the claims asserted by Plaintiffs against Mattress Firm, including Tempur-Pedic's claims that Mattress Firm's advertising violated the Lanham Act and the Letter Agreement.

Mattress Firm has also told this Court the same thing. Specifically, in opposing Tempur-Sealy's motion for a TRO, Mattress Firm recognized that "Tempur Sealy asserts that Mattress Firm's 'closeout of remaining inventory' advertising campaign **violates its advertising guidelines**, which it claims are incorporated by reference into the Letter Agreement and MRA." (ECF No. 18 at 18) (emphasis added)). This Court likewise recognized these allegations and summarized them when it denied Tempur-Sealy's motion for a TRO   (ECF. No. 23 at 10) ("Tempur Sealy also alleges that Mattress Firm's use of its mark is harming competing businesses selling Tempur-Sealy products, **especially given the deeply discounted offerings** made by Mattress Firm in its final sale of the Tempur-Sealy mattresses in its inventory.") (emphasis added).

## VI.  DR. MEYER'S QUALIFICATIONS AND ANALYSIS

### A.  Dr. Meyer's Qualifications

Christine S. Meyer, Ph.D. is Managing Director of NERA Economic Consulting, a global economics consulting firm headquartered in New York with 25 offices worldwide with hundreds of affiliated economists and other professionals. (Meyer Report, ¶1 and Ex. 1 ("Meyer cv"); App., Ex. A). *See also* www.nera.com. Dr. Meyer holds a Ph.D. in economics from the Massachusetts Institute of Technology and B.S. degree in economics from the United States Military Academy at West Point. (Meyer Report, ¶1 and Meyer cv.). Before joining NERA Economic Consulting in 2000, Dr. Meyer taught economics at M.I.T., Bentley College, and Colgate University. (*Id.*) Since joining NERA, Dr. Meyer has analyzed economic damages in a wide variety of cases arising from,

among other claims, breach of contract and trademark infringement. (Meyer Report, ¶ 2; App., Ex. A). She has written articles about economic damages and has been asked to speak about economic issues on numerous occasions, including by the Federal Trade Commission in hearings concerning intellectual property matters. (*Id.*) Dr. Meyer has testified numerous times in state and federal court as an expert witness on economic damages; for example, during the period 2013-2017, she was qualified and testified as an expert economist seven times in the federal courts. (Meyer cv, pp. 3-6; App. Ex. A).

**B.    Dr. Meyer's Analysis**

Dr. Meyer's analysis in this case is summarized in her two expert reports. (App., Exs. A and B).[2] In them, she observed that the Ad Requirements expressly "forbid the use of discount advertising," that the Once-in-a-Lifetime Campaign appeared to violate the Ad Requirements, and that her assignment was to "measure the damages resulting from such alleged wrongful conduct by Mattress Firm." (Meyer Report, ¶¶ 4, 31; App., Ex. A). She concluded that "[b]ut for the alleged wrongful conduct by Mattress Firm, Tempur-Pedic would have sold substantially more mattresses than it actually did between March and early May 2017," resulting in lost profits of $13.4 million. (*Id.*, ¶¶ 8-9).

Dr. Meyer utilized a generally-accepted approach for determining causation and calculating damages, the "before-and-after" methodology. (*Id.*, ¶¶ 40-41 & n.64). As detailed in the Meyer Report, she isolated the time period during which the Once-in-a-Lifetime Campaign advertisements ran, together with Mattress Firm's associated weekly Campaign expenditures. (Meyer Report, Ex. 3; App. Ex. A). Mattress Firm spent approximately $37.5 million on advertisements comprising the Once-in-a-Lifetime Campaign from March 5, 2017 through May 6,

---

[2] In connection with her work on this case, Dr. Meyer reviewed the materials set forth in Exhibit 2 to the Meyer Report and Exhibit 2 to the Meyer Rebuttal Report.

2017 (the "Damages Period").  (*Id.*)  Dr. Meyer then reviewed Tempur-Pedic's sales to Other

Retailers and directly to consumers ("DTC") during the Damages Period and two "benchmark"

periods immediately before and after the Damages Period.  (*Id.*, Ex. 6).  As Dr. Meyer explained:

> My analysis, which isolates the effect of the harmful act by
> considering the difference between Tempur-Pedic's economic
> position in the actual world and its position had the harmful act not
> occurred, is standard for damages analysis. [Citation omitted.]  My
> approach considers what [Tempur-Pedic's] sales and profits would
> have been in the damages period but for the violation from a base
> experience unaffected by the violation…. Using these benchmarks,
> I can predict what sales would have been in the absence of the
> alleged wrongful conduct.

(Meyer Report, ¶¶ 40-41).

Dr. Meyer's analysis shows substantial reductions in Tempur-Pedic's sales—both to Other

Retailers and DTC—during the Damages Period.  (Meyer Report, Ex. 6)  Specifically, in the weeks

leading up to the Damages Period (the "First Benchmark Period"), Tempur-Pedic's sales to Other

Retailers were increasing each week, climbing from ~$6.9 million to ~$10.8 million.  (*Id.*)  When

Mattress Firm launched its campaign, Tempur-Pedic's sales fell nearly 35% and remained at those

depressed levels until the end of the Campaign, when they resumed near-normal levels.  (*Id.*)  Dr.

Meyer performed the same analysis for Tempur-Pedic's DTC sales and found precisely the same

pattern—a substantial drop in Tempur-Pedic's sales upon the launch of the Once-in-a-Lifetime

Campaign, remaining depressed until it ended, whereupon sales promptly returned to near-normal

levels.  (Meyer Report, Ex. 7).[3]

---

[3] To exclude seasonality as a possible reason for the drop in Tempur-Pedic's sales, Dr.
Meyer compared each week's sales in 2017 with the corresponding week in 2016.  She used the
ratio of 2017 weekly sales to those in 2016 during the First Benchmark Period to calculate what
sales during the Damages Period would have been in the "But-For World."  (Meyer Report, Exs
6-7).  To exclude the possibility that 2016 might be an aberrational year, Dr. Meyer compared each
week's sales in 2016 to the corresponding weeks in 2015 and found that sales were by comparing
Tempur-Pedic's sales levels in 2017 with the corresponding week in the previous year, 2016.
(Meyer Report, n. 69).

As part of her analysis, Dr. Meyer excluded a number of possible alternative explanations for the reduction in Tempur-Pedic's sales during the Damages Period. First, as noted in the preceding footnote, Dr. Meyer ruled out the possibility that this reduction could be attributed to seasonal variance in mattress sales. (Meyer Report, n. 69, Exs. 6 and 7). Second, she ruled out the possibility that 2016 might be an aberrational year (and therefore an inappropriate basis to adjust for seasonality) by comparing it to 2015. (*Id*., n. 69). Third, Dr. Meyer ruled out the possibility that the Once-in-a-Lifetime Campaign could have overlapped with other (permissible) Mattress Firm advertisements that might have influenced a change in consumer behavior. (Meyer Rebuttal Report, ¶¶ 36-37, 48; App., <u>Ex. B</u>). Fourth, she ruled out the possibility that Tempur-Pedic's lost sales could be attributable to price increases by Other Retailers or Tempur-Pedic itself. (Meyer Report, ¶¶ 10.b, 38-40; App., <u>Ex. A</u>). Finally, she ruled out the possibility that lost sales to Other Retailers were offset by any higher sales to Mattress Firm. (*Id*., ¶¶ 10.c, 44-45).

In sum, Dr. Meyer's analysis was thorough, reliable, and shows a clear loss of sales of Tempur-Pedic sales and profits proximately caused by Mattress Firm's breach of Tempur-Pedic's Ad Requirements.

## VII.    ARGUMENT

### A.    Mattress Firm's Motion For Summary Judgment On Plaintiff's Damages Claim Should Be Denied.

Mattress Firm argues that it is entitled to summary judgment on plaintiff's damages claims because Tempur-Pedic has not actually claimed a breach of the Ad Requirements. (ECF 107 at 4-5). Mattress Firm is wrong. The Complaint explicitly alleges that Mattress Firm's Once-in-a-Lifetime Campaign violated its contractual obligations to Tempur-Pedic:

> Mattress Firm has initiated a new advertising campaign focused on selling Tempur-Pedic and Sealy products in its inventory. The campaign promotes a "once in a lifetime" opportunity to save "70%" off famous name brands such as Tempur-Pedic and Sealy…. The

vast majority of infringing material <u>feature Tempur-Sealy product being discounted or as clearance items</u>. <u>Mattress Firm promised in Section 15 of the Master Retailer Agreements that it would abide by the advertising requirements issued by Tempur and Sealy</u> … [which] <u>expressly forbid the use of discount advertising</u> because it cheapens Tempur-Sealy's premium brand image. Mattress Firm's advertising undermines the significant investment Tempur-Sealy made to promote that image, and is unfair to retailers who do abide by the advertising requirements…."

Fifth Amended Complaint (the "Complaint"), ¶¶ 40, 42.[4]  Thus, contrary to Mattress Firm's argument, the Complaint plainly alleges that (1) Mattress Firm "promised [to] abide by the advertising requirements," and (2) Mattress Firm's Once-in-a-Lifetime Campaign featured Tempur-Pedic products "being discounted or [sold] as clearance items," in violation of the Ad Requirements.  The Complaint further alleges that "Mattress Firm's wrongful conduct has resulted in damages to [plaintiffs, who] will continue to, suffer actual damages, loss of customer goodwill, loss of reputation, diminished capacity to compete, diverted business, lost profits both past and future, costs and expenses, and other loss, as result of Mattress Firm's unlawful conduct."  Complaint, ¶168.  Accordingly, Tempur-Pedic has properly alleged that Mattress Firm violated the Ad Requirements, causing it to sustain damages, including those resulting from "diverted business" and associated "lost profits."

Mattress Firm's current position that Tempur-Pedic never alleged that it violated the Ad Requirements is disingenuous considering the statements and arguments it has made to this Court. Specifically, when opposing Tempur-Sealy's TRO motion, Mattress Firm repeatedly recognized Tempur-Sealy's allegations concerning the Ad Requirements:

- In addition to its allegation that Mattress Firm is using its marks without authorization, Tempur Sealy asserts that Mattress Firm's 'closeout of remaining

---

[4] Plaintiffs alleged that Section 15 of the Master Retailer Agreement was incorporated by reference in the Letter Agreement.  Complaint, ¶ 73.  *See also* Letter Agreement, Sec. 2; App., <u>Ex. C</u>.

inventory' advertising campaign violates its advertising guidelines, which it claims are incorporated by reference into the Letter Agreement and MRA.

- Tempur Sealy has offered no competent evidence of what its advertising guidelines provide, much less demonstrated that Mattress Firm's advertising violates them.

- The only 'evidence' Tempur Sealy cites is its own pleadings, which merely assert, with no further detail or explanation, that its guidelines forbid the use of discount advertising.

(ECF 18 at 18-19). In denying Tempur-Sealy's TRO motion, this Court likewise recognized these allegations, observing that "Tempur Sealy also alleges that Mattress Firm's use of its mark is harming competing businesses selling Tempur-Sealy products, **especially given the deeply discounted offerings** made by Mattress Firm in its final sale of the Tempur-Sealy mattresses in its inventory." (ECF. No. 23 at 10) (emphasis added).

On this record, there is no dispute that Tempur-Pedic adequately alleged that Mattress Firm's discount advertising campaign violated the Ad Requirements and that Mattress Firm was plainly aware of those allegations from the commencement of this case. *See, e.g., Montoya v. FedEx Ground Package System, Inc.,* 614 F.3d 145, 148 (5th Cir. 2010) ("'A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'") (*quoting Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1940 (2009)). Because Mattress Firm was plainly aware that Tempur-Pedic alleged that it was liable for breach of the Ad Requirements, which were incorporated by reference in the Letter Agreement and MRA, its motion for summary judgment should be denied.

Moreover, contrary to Mattress Firm's contention, Tempur-Pedic has evidence of actual damages to defeat Mattress Firm's summary judgment motion. As Richard Anderson testified at his deposition, Mattress Firm's Once-in-a-Lifetime Campaign caused consumers to come to Mattress Firm for "once in a lifetime" prices, rather than purchase from Other Retailers. Those Other Retailers then swiftly and substantially reduced their purchases and promotion of Tempur-

Pedic products, which resulted in lost profits for Tempur-Pedic. (Anderson Dep. at 157:16-158:20, 169:6-170:22; App., <u>Ex. G</u>). And, as described in more detail below, Dr. Meyer's expert testimony is plainly relevant to proof of Tempur-Pedic's damages and cannot be excluded as irrelevant. *See* Fed. R. Evid. 403(a) ("Evidence is relevant if (a) it has *any* tendency to make a fact more or less probable than it would be without the evidence, and (b) the fact is of consequence in determining the action.") (emphasis added). Because Tempur-Pedic has evidence of actual damages and all of Mattress Firm's attacks on Dr. Meyer's proffered testimony go to the weight it should be given by a fact-finder, not its admissibility, Mattress Firm's motion for summary judgment on damages must be denied. *See, e.g., PPD Enterprises, LLC v. Stryker Corp.,* No. 4:16-cv-00507, 2017 WL 4950064 at *2 (S.D. Tex. Nov. 1, 2017) ("The court concludes that PPD has presented sufficient evidence of damages to survive summary judgment on its breach of contract claim."); *Merritt Hawkins & Associates, LLC v. Gresham,* 79 F. Supp. 3d 625, 633-34 (N.D. Tex. 2015) ("based on Smith's testimony, MHA has offered sufficient evidence of damages to survive summary judgment on its claims.").

### B. Mattress Firm's Motion to Exclude Dr. Meyer Should Be Denied.

In evaluating an expert's testimony under Rule 702, the court takes on a "gatekeeping role" and makes a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert,* 509 U.S. at 592-93, 597. To admit an expert's testimony, the court must determine that it is both relevant and reliable. *Id.* at 589. In making the reliability determination, the Supreme Court has indicated that the trial court may consider whether the expert's theory or technique (1) can or has been tested, (2) is subject to peer review and publication, (3) has a high known or potential error rate or standards controlling its operation, and (4) is generally accepted in the relevant scientific community. *Kumho Tire Co. v. Carmichael*, 526 U.S.

137, 149, 119 S. Ct. 1167 (1999) (citing *Daubert*, 509 U.S. at 592-94). These factors are "not a definitive checklist and may not be relevant to assessing the expert's reliability in every case." *Barclay v. Lloyds*, No. 4:14-cv-03649, 2016 WL 164113 at *2 (S. D. Tex. Jan. 14, 2016).

### 1.    Dr. Meyer's proffered testimony is relevant.

As noted above, Mattress Firm's argument that Dr. Meyer's testimony should be excluded because Tempur-Pedic has not actually claimed a breach of the Ad Requirements is plainly wrong. Tempur-Pedic has alleged (as previously recognized by Mattress Firm) that Mattress Firm violated the Ad Requirements, causing it to sustain damages, including those resulting from "diverted business" and associated "lost profits." Dr. Meyer's testimony is relevant proof of the damages that ensued from these violations, and cannot be excluded as irrelevant. Fed. R. Evid. 403(a) ("Evidence is relevant if (a) it has *any* tendency to make a fact more or less probable than it would be without the evidence, and (b) the fact is of consequence in determining the action.") (emphasis added).

### 2.    Dr. Meyer's proffered testimony is reliable.

Dr. Meyer's proffered opinions are admissible because (i) her qualifications to testify as an expert on commercial damages are unchallenged; (ii) her employment of the "before-and-after" methodology for determining causation and damages is commonly accepted by economists and the courts; and (iii) her opinions and supporting analysis are logical and reliable within the meaning of Fed. R. Evid. 702.

### a.    It is undisputed that Dr. Meyer is well qualified.

As set forth above and in the Meyer cv, Dr. Meyer is well qualified and has considerable expertise in the area of economics, and specifically, the determination of commercial damages. Mattress Firm has not challenged Dr. Meyer's qualifications to testify as an expert witness on the subject of Tempur-Pedic's economic damages. Thus, Dr. Meyer should be deemed qualified for purposes of Fed. R. Evid. 702.

**b.     Dr. Meyer used a generally-accepted methodology for determining causation and economic damages.**

Dr. Meyer relied on the "before-and-after" approach to determining damages—an approach that has been endorsed repeatedly by both courts and economists.  "Under the before-and-after approach, the plaintiff compares the plaintiff's business before and after the alleged harmful acts were committed by the defendant."   K. Kowalski and M. Kuga, *Measuring Commercial Damages via Lost Profits or Loss of Business Value: Are These Measures Redundant or Distinguishable?* 18 Journal of Law & Commerce, 1, 30 (1998) at 4.  The "before-and-after approach is the prototype for proof of damages." R. Blair and W. Page, *Speculative Antitrust Damages*, 70 Wash. L. Rev. 443 (1995).  *See, e.g., Floorgraphics, Inc. v. News America Marking In-Store Services, Inc*., 546 F.Supp.2d 155, 172 (D. N.J. 2008) ("the 'before and after' method is recognized by experts in the field as an acceptable method to calculate lost profits"); *In re Live Concert Antitrust Litigation,* 247 F.R.D. 98, 145 (C.D. Cal. 2007) (the "before-and-after methodology has been accepted by numerous courts"); *Cardiac Pacemakers, Inc. v. Aspen II Holding Co., Inc.,* No. 0:04-cv-04048, 2006 WL 1071886 *3 (D. Minn. 2006) ("the before-and-after model that Nicholson employed is an accepted method for calculating damages"); *Heatransfer Corp. v. Volkswagenwerk A.G.,* No. 72-H-1429, 1975 WL 894 at *5 (S.D. Tex. 1975) ("plaintiff asked the jury to assume no more . . . than is traditionally asked of a jury in any case in which damages are proved by reliance upon the more traditional 'before-and-after' method of proving damages").

The sales data analyzed by Dr. Meyer showed that almost immediately upon the launch of the Once-in-a-Lifetime Campaign, Tempur-Pedic's sales into two independent channels—Other Retailers and DTC—plummeted, and then remained at artificially low levels until the Campaign

ended, whereupon they promptly rebounded nearly to pre-Campaign levels.[5]  Mattress Firm calls

this "an apparent two-month anomaly in Tempur-Pedic's sales trend" (ECF No. 106 at 9), and of

course, it will be free to argue to the jury that the near-perfect overlap of Tempur-Pedic's sales

loss with the Once-in-a-Lifetime Campaign was merely a coincidence or "anomaly."  But Tempur-

Pedic must be allowed to proffer Dr. Meyer's analysis which shows that it was not.

In support of its Motion, Mattress Firm provides a preview of its cross-examination of Dr.

Meyer; namely, that she supposedly failed to investigate "industry advertising practices," has not

explained why Tempur-Pedic's sales "were up 30% in 2017 compared to 2016," and conducted

no "consumer surveys" to "understand why [consumers'] purchasing patterns may have changed"

during the Damages Period.  (ECF No. 106 at 10).  While these points may go the weight to be

given Dr. Meyer's testimony by the jury, they have little to do with its reliability or admissibility

under Rule 702.  As this Court has stated:

> As a gatekeeper of testimony, the court cannot weigh the expert's
> findings; the court must only consider whether the expert's
> "principles and methods" are reliable. FED. R. EVID. 702.  Indeed,
> "questions relating to the bases and sources of an expert's opinion
> affect the weight to be assigned that opinion rather than its
> admissibility and should be left for the jury's consideration." In
> other words, the *Daubert* analysis exists to judge methods, not
> conclusions.

*Ariwodo v. U.S. Customs & Immigration Enforcement,* 72 Fed. R. Evid. Serv. 560, 2007 WL

580845 at *4 (S.D. Tex. 2007), quoting *United States v. 14.38 Acres of Land,* 80 F.3d 1074, 1077

(5th Cir. 1996); *see also Taylor v. U.S. Bank Nat'l Ass'n,* No. H–12–3550, 2015 WL 507526 at

---

[5] From her interviews of Tempur-Pedic management, Dr. Meyer did not identify any plausible reason why Tempur-Pedic's sales in two different channels would drop during the precise time period of the Once-in-a-Lifetime Campaign, other than the obvious: "the data show that the adverse effect of the Mattress Firm Advertising precipitated a reduction in sales of Tempur-Pedic Products."  (Meyer Report, ¶ 36; App., Ex. A).

*13 (S.D. Tex. Feb. 6, 2015) ("Concerns about the factual basis of [the expert's] opinion go to the weight of the opinion, not its admissibility").

Mattress Firm's heavy reliance on *Verisign, Inc. v. XYZ.COM, LLC*, 848 F.3d 292 (4th Cir. 2017) is misplaced. That case is distinguishable. In *Verisign*, the plaintiff was the exclusive operator of the .com and .net top-level domains, and the defendant was a newly formed competitor, offering the .xyz top-level domain.[6] The plaintiff, Verisign, alleged that the CEO of the defendant, XYZ, made certain false statements about the competing domains. Unlike Mattress Firm's advertising in this case, the alleged XYZ statements "were distributed to a narrow audience, comprised mostly of readers of XYZ's blog and a small percentage of [customers]" and had "limited potential to influence the domain name market." *Verisign*, 848 F.3d at 301. Verisign's expert observed that Verisign's registrations (i.e., sales) of its .net domain had been falling during the time period in which the alleged false statements were made, but ignored (among other things) the fact that those registrations had been falling *before* the false statements were made. *Verisign, Inc. v. XYZ.COM, LLC*, No. 1:14-cv-01749, 2015 WL 7430016 *5 (E.D. Va. Nov. 20, 2015) (expert "failed to account for the decline in Plaintiff's <.net> sales prior to Defendant's statements"). The expert also ignored the fact that the .net registrations were falling at a time when competition was increasing, and "hundreds of new top-level domains were clamoring for attention in a newly competitive market," providing a far more likely explanation for the decline in Verisign's .net registrations. *Verisign*, 848 F.3d at 301.

Mattress Firm's claim that "Meyer's analysis here is indistinguishable from the excluded analysis in Verisign" (ECF No. 106 at 12) is wrong. Unlike the *Verisign* case, Tempur-Pedic was

---

[6] As the Court in *Verisign* explained, "a domain name is the string of characters in an Internet address. In the domain name 'uscourts.gov,' for instance, the '.gov' element of the name is referred to as a top-level domain." 848 F.3d at 295.

not experiencing a decline in sales *prior to* the "Once-in-a-Lifetime" Campaign.  On the contrary, Tempur-Pedic's sales had been climbing in the weeks leading up to the Campaign, only to crash once it launched.  And also unlike the *Verisign* case, Tempur-Pedic's sales rebounded once the Campaign ended, further corroborating the causal link.  Finally, unlike the *Verisign* case, there is no alternative, market-based explanation for the drop in Tempur-Pedic's sales other than the Campaign itself.[7]  As discussed above, Dr. Meyer ruled out seasonality and other possible explanations for Tempur-Pedic's drop in sales during the Damages Period; and the Fifth Circuit has made clear that an expert need not rule out every such alternative explanation to satisfy Rule 702.  *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 249-50 (5th Cir. 2002) (reversing district court's exclusion of an expert witness, in part because of the expert's alleged failure to eliminate "many viable alternative sources," ruling that the "standard of reliability" applied by the district court was overly stringent); *see also Barclay*, 2016 WL 164113 at *3 (expert need not rule out all plausible alternative causes of damage).

### 3.    Unlike Tempur-Pedic, Sealy is not a high-end, "no-discount" brand.

Relying on its own expert's opinion, Mattress Firm proclaims that "Sealy data proves that Meyer's methodology is invalid."  (ECF No. 106 at 14).  To begin with, it is axiomatic that the competing views of experts can be resolved only by the jury.  *See 14.38 Acres of Land*, 80 F.3d at 1078 (trial court must give "proper deference to the jury's role as the arbiter of disputes between conflicting opinions," and "questions relating to the bases and sources of an expert's opinion affect

---

[7] Mattress Firm appears to argue that Dr. Meyer failed to separate "discount" advertisements which ran as part of the Once-in-a-Lifetime Campaign from those which allegedly do not violate the Ad Requirements.  (ECF No. 106 at 13).  Again, such a critique would go to the weight of the evidence rather than its admissibility.  In any event, Dr. Meyer reviewed the ads that ran during the Campaign and determined that virtually all of them included use of Tempur-Pedic's name in conjunction with an offer of substantially reduced prices.  (Meyer Rebuttal Report, ¶¶ 46-48; App., Ex. B).

the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration"); Fed. R. Evid. 702, Advisory Comm. Note ("When facts are in dispute, experts sometimes reach different conclusions based on competing versions of the facts. The emphasis in the amendment on 'sufficient facts or data' is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other.").

Further, Sealy occupies a different segment of the market than does Tempur-Pedic, so Mattress Firm's contention that the Once-in-a-Lifetime Campaign did not harm Sealy is not surprising or material.  As Dr. Meyer explains, "Tempur-Pedic has consistently been a premium brand with a unilateral price policy whereas Sealy is considered a mainstream brand that routinely offers discounts."  (Meyer Rebuttal Report, ¶ 30; App., Ex. B).  This is borne out by the respective, average wholesale price of the two brands; Tempur-Pedic is over four times more expensive than Sealy.  (*Id.*, ¶ 31).  Unlike Sealy, which is often on sale or discounted, when Tempur-Pedic is offered at prices "up to 70% off," it is indeed a "once-in-a-lifetime" event—one that would occur only when a rogue retailer decides to breach the Ad Requirements on its way out the door.

## VIII.  CONCLUSION

Mattress Firm's contention that Tempur-Pedic never claimed any violations of its advertising guidelines is demonstrably untrue, as the complaint shows and as Mattress Firm's own representations in this Court aptly show.  Accordingly, because Tempur-Pedic properly alleged that Mattress Firm's discount advertising campaign violated the Ad Requirements (which were incorporated by reference in the Letter Agreement and MRA) and has sufficient evidence of actual damages caused by Mattress Firm's Once-in-a-Lifetime Campaign, Mattress Firm's motion for summary judgment on damages should be denied.

Moreover, Tempur-Pedic has carried its burden under Fed. R. Evid. 702 to demonstrate the relevance and reliability of Dr. Meyer's proffered expert testimony. Mattress Firm's arguments concern the "bases and sources" of Dr. Meyer's testimony and therefore go to its weight, not its admissibility. *14.38 Acres of Land*, 80 F.3d at 1078. Consideration of that weight falls squarely within the province of the jury. "[T]he trial court's role as gatekeeper [under Rule 702] is not intended to serve as a replacement for the adversary system," *Pipitone,* 288 F.3d at 249-50, and "proper deference" must be afforded to "the jury's role as the arbiter of disputes between conflicting opinions." *14.38 Acres of Land*, *supra*. Thus, Mattress Firm's motion to exclude Dr. Meyer should be denied.

Respectfully submitted,

**TEMPUR-PEDIC NORTH AMERICA, LLC,
SEALY MATTRESS COMPANY, DAN-FOAM
APS, SEALY TECHNOLOGY LLC,**

By their attorneys,

*/s/ Robert J. Carty, Jr.*
Robert J. Carty, Jr., Attorney-in-Charge
Texas Bar No. 00788794
S.D. Texas I.D. No. 22790
Jesse M. Coleman
Texas Bar No. 24072044
S.D. Texas I.D. No. 1101514
John P. Phillips
Texas Bar No. 24083659
S.D. Texas I.D. No. 1691762
SEYFARTH SHAW LLP
700 Milam Street, Suite 1400
Houston, TX 77002
713-225-2300 (Telephone)
Email: rcarty@seyfarth.com
        jmcoleman@seyfarth.com
        jphillips@seyfarth.com

William N. Berkowitz (admitted *pro hac vice*)
Brandon L. Bigelow (admitted *pro hac vice*)
William F. Benson (admitted *pro hac vice*)
SEYFARTH SHAW LLP
Two Seaport Lane, Suite 300
Boston, MA 02210
617-946-4800 (Telephone)
Email: wberkowitz@seyfarth.com
        bbigelow@seyfarth.com
        wbenson@seyfarth.com

Dated:  February 9, 2018

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 9, 2018, the foregoing instrument was filed with the clerk of the court using the CM/ECF system, which will send notification of such filing to all counsel of record, including the following:

John B. Thomas, Esq.
J. Stephen Barrick, Esq.
Kelsey Machado, Esq.
HICKS THOMAS LLP
700 Louisiana St., Suite 2000
Houston, TX  77002

*/s/ Robert J. Carty, Jr.*
Robert J. Carty, Jr.

21