UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

TEMPUR-PEDIC NORTH AMERICA, LLC, *et al.*, §
§
*Plaintiffs*, §
§
v. § CIVIL ACTION H-17-1068
§
MATTRESS FIRM, INC., §
§
*Defendant*. §

### AMENDED MEMORANDUM OPINION AND ORDER

Pending before the court is defendant Mattress Firm, Inc.'s ("Mattress Firm") motion for summary judgment on its offset defense. Dkt. 111. Plaintiffs responded and requested summary judgment on that defense. Dkt. 117. Having considered the motion, response, evidence, and applicable law, the court is of the opinion that Mattress Firm's motion should be GRANTED and plaintiffs' request for summary judgment should be DENIED.

### I. BACKGROUND

This case involves an on-going business dispute between the plaintiffs, Tempur-Pedic North America, LLC ("Tempur-Pedic"), Sealy Mattress Company ("Sealy"), Dan-Foam APS, and Sealy Technology LLC (collectively, "Tempur-Sealy"), and Mattress Firm. Dkt. 101. Tempur-Sealy is a mattress manufacturer and distributor that owns trademarks for Tempur, Tempur-Pedic, Sealy, Sealy Posturepedic, Sterns and Foster, and others (collectively, "Tempur-Sealy Marks"). Dkt. 3-1; Dkt. 3-2. Mattress Firm is a mattress retailer that sold Tempur-Sealy branded mattresses for nearly twenty years. Dkt. 105-1 at 2. While Mattress Firm was an authorized Tempur-Sealy retailer, the parties' relationships were governed by two Master Retailer Agreements ("MRA") that are

substantially similar: one with Sealy ("Sealy MRA") and one with Tempur-Pedic ("Tempur MRA"). *Id.* at 3; Dkt. 111-1 (Sealy MRA); Dkt. 111-2 (Tempur MRA).

In January 2017, the parties dissolved their MRAs. Dkt. 105-1 at 4, 6. Then, Mattress Firm entered into letter agreements with Tempur-Pedic ("Tempur Letter Agreement") and Sealy ("Sealy Letter Agreement") (collectively, "Letter Agreements"), which governed the parties' relationship following the termination of the MRAs. Dkt. 111-4 (Tempur Letter Agreement); Dkt. 111-3 (Sealy Letter Agreement). Under the Letter Agreements, Tempur-Sealy and Mattress Firm agreed that their relationship would continue through April 3, 2017. Dkt. 111-3 at 2; Dkt. 111-4 at 2. Tempur-Sealy agreed to continue to sell its products to Mattress Firm through that date at a volume of up to "110% of the corresponding period in 2016." Dkt. 111-3 at 3; Dkt. 111-4 at 3.

Despite the Letter Agreements, more disputes arose. Tempur-Sealy sued Mattress Firm alleging breach of contract and trademark infringement under common law and the Lanham Act. Dkt. 101. Most of Tempur-Sealy's claims involve Mattress Firm's continued use of Tempur-Sealy Marks, but Tempur-Sealy also claims that "Mattress Firm breached its obligations by failing to pay for all of the products it ordered and received." *Id.* at 29. Mattress Firm asserted an affirmative defense that it is entitled to offset its obligations by any outstanding merchandise credit balances or any financial obligation owed to it by Tempur-Sealy. Dkt. 104 at 19. Mattress Firm moves for summary judgment on its offset defense. Dkt. 111. In its response, Tempur-Sealy also requests summary judgment on that defense. Dkt. 117.

## II. LEGAL STANDARDS

### A. Summary Judgment

A court shall grant summary judgment if a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P.

56(a).  "[A] fact is genuinely in dispute only if a reasonable jury could return a verdict for the nonmoving party." *Fordoche, Inc. v. Texaco, Inc.*, 463 F.3d 388, 392 (5th Cir. 2006).  "Cross-motions must be considered separately, as each movant bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law." *Shaw Constructors v. ICF Kaiser Eng'rs*, 395 F.3d 533, 538–39 (5th Cir. 2004) (footnote omitted).  If the moving party meets its burden, the burden shifts to the non-moving party to set forth specific facts showing a genuine issue for trial.  Fed R. Civ. P. 56(e).  The court must view the evidence in the light most favorable to each non-movant and draw all justifiable inferences in favor of each non-movant.  *Ford Motor Co. v. Tex. Dep't of Transp.*, 264 F.3d 493, 498 (5th Cir. 2001).  "If there is no genuine issue and one of the parties is entitled to prevail as a matter of law, the court may render summary judgment."  *Shaw Constructors*, 395 F.3d at 539 (footnote omitted).

**B.     Principles of Contract Interpretation**

Under Texas law,[1] the court decides as a matter of law whether a contract is ambiguous "by examining the contract as a whole in light of the circumstances present when the contract was entered."  *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex. 1996).  Contract language is unambiguous when it "can be given a certain or definite meaning."  *Universal Health Servs., Inc. v. Renaissance Women's Grp., P.A.*, 121 S.W.3d 742, 746 (Tex. 2003).  By contrast, "an ambiguity arises when an agreement is susceptible to more than one reasonable meaning."  *Id.*  If a contract is ambiguous, the parties' intent is a question of fact.  *Grohman v. Kahlig*, 318 S.W.3d 882, 887 (Tex. 2010).  However, an unambiguous contract should be interpreted by the court as a matter of law, and the court must enforce the contract as written.  *Id.*;

---

[1] As the court already held, the court will only consider Texas law in construing the Letter Agreements.  Dkt. 128 at 4 n.1.

3

*Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996). "In construing a written contract, the primary concern of the court is to ascertain the true intentions of the parties as expressed in the instrument." *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 662 (Tex. 2005). The court "should examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless." *Id.* The court gives the contract terms their "plain, ordinary, and generally accepted meanings unless the contract itself shows them to be used in a technical or different sense." *Id.*

### III. ANALYSIS

**A.    Release**

The parties primarily dispute whether Mattress Firm released its offset claim. To resolve that dispute, the court must turn to their agreements. Section 7 of the Letter Agreements provides:

> 7. Release and Waiver of Claims. (a) Effective upon execution and delivery of this letter agreement, Mattress Firm, both for itself and its parent companies, stockholders, subsidiaries, affiliates, directors, officers and employees (collectively, the "MF Releasing Parties"), (i) irrevocably waive and fully release [Tempur-Sealy] and its parent companies, stockholders, subsidiaries, affiliates, directors, officers and employees ("[Tempur-Sealy] Released Parties") from any and all claims, demands, costs, and liabilities of any nature, known or unknown, fixed or contingent, under any theory or cause of action, relating to or arising out of the MRA and Program Agreement or their termination ("MF Release Claims") and (ii) covenants that none of the MF Releasing Parties will commence litigation in any forum or otherwise assert any claim with respect to the MF Released Claims, as a direct claim, set-off or counterclaim or otherwise, and will fully indemnify the [Tempur-Sealy] Released Parties from any such claim. For the avoidance of doubt, the Parties acknowledge that the term MF Released Claims is not intended to include any claim for failure to perform any post-termination obligation under the MRA and Program Agreement that survives their termination, or any obligation under this letter agreement.

Dkt. 111-3 at 4–5; Dkt. 111-4 at 5–6.

Tempur-Sealy argues that Section 7 releases Mattress Firm's offset claim because the disputed payments arose prior to January 30, 2017, when the parties entered into the Letter

Agreements. *See* Dkt. 117 at 13. Mattress Firm argues that Section 7 does not include its offset claims. *See* Dkt. 111 at 9. According to Mattress Firm, "the released claims identified in Section 7 '*[are] not intended to include* any claim for failure to perform . . . any obligation under [the] [L]etter [A]greement[s].'" *Id.*

Under Texas law, "[a]lthough general releases are narrowly construed, broadly worded general releases are enforceable as long as the claim in question is included within the wording of the release." *Southmark Corp. v. F.D.I.C.*, 142 F.3d 1279, 1998 WL 224537, at *3 (5th Cir. 1998). "However, a general release that is not limited to a specific cause of action or occurrence, and broadly releases all claims and causes of action between two parties, is valid and enforceable." *Id.* at *4. Here, the release includes "any and all claims, demands, costs, and liabilities of any nature, known or unknown, fixed or contingent, under any theory or cause of action, relating to or arising out of the MRA." Dkt. 111-3 at 4–5; Dkt. 111-4 at 5. The release then clarifies that it "is not intended to include any claim for failure to perform any post-termination obligation under the MRA . . . or any obligation under [the] [L]etter [A]greement[s]." Dkt. 111-3 at 5; Dkt. 111-4 at 6. Thus, the release includes any claim relating to or arising out of the MRA, but not claims for failure to perform a post-termination obligation or an obligation under the Letter Agreements. Mattress Firm relies on Sections 2 and 4 of the Letter Agreements to support its argument that the offset claims are post-termination obligations under the Letter Agreements. Dkt. 111 at 9–10. Tempur-Sealy argues that Sections 2, 3, and 4 support its release theory. Dkt. 117 at 15–17.

    1.    *Section 2 of the Letter Agreements*

Section 2 provides:

> 2. Applicable Terms. Sections 1, 3, 4, 5, 6, 7, 8, 14.a and 14.b, 15, 16, 19, 20, 21, 22, and 24–31 of the MRA shall apply to the New Sales and this letter

5

agreement, as modified by this letter agreement, as if the MRA were still in effect.

Dkt. 111-3 at 3; Dkt. 111-4 at 3. Mattress Firm argues that Section 2 incorporates Sections 5 and 8 of the MRAs. Dkt. 111 at 9. Tempur-Sealy argues those sections are only incorporated for "New Sales," which are defined as sales from January 30, 2017–April 3, 2017. Dkt. 117 at 15–16.

Mattress Firm offers the only reasonable interpretation of Section 2. Tempur-Sealy quotes a portion of Section 2 that states certain sections "of the MRA shall apply to the New Sales . . . ." *Id.* at 16. However, the omitted portion of Section 2 states that the MRA "shall apply to the New Sales *and this letter agreement* . . . ." Dkt. 111-3 at 3; Dkt. 111-4 at 3 (emphasis added). If the stated sections of the MRA only apply to "New Sales," then the second phrase has no meaning. *Cf. Dorsett*, 164 S.W.3d at 662 (the court should give effect to every provision in a contract). Tempur-Sealy attempts to add a limitation to Section 2 that the language expressly precludes. *Cf. Frontier Logistics, L.P. v. Nat'l Prop. Holdings, L.P.*, 417 S.W.3d 656, 660 (Tex. App.—Houston [14th Dist.] 2013, pet. denied) (the court cannot rewrite the contract to add to its language). Thus, Tempur-Sealy's interpretation is not reasonable. Only Mattress Firm's interpretation gives meaning to the words of the contract. Section 2 specifies that the MRA sections are incorporated into the Letter Agreements and apply to "New Sales" created under the Letter Agreements. Thus, the Letter Agreements incorporate Sections 5 and 8 of the MRAs.

Section 8 of the MRAs provide in relevant part:

> i. Retailer shall promptly pay to Vendor all sums due and payable for the Products purchased by Retailer prior to the date of termination, as such amount may be offset by any outstanding merchandise credit memorandum;
>
> ii. Vendor shall remit to Retailer the balance of any merchandise credit memorandum in immediately available funds within 30 days of the date of termination . . . .

6

Dkt. 111-2 at 4; Dkt. 111-1 at 4 (Section 8 of the Sealy MRA contains substantially similar language). Tempur-Sealy does not dispute that Section 8 allows Mattress Firm to offset payments for products "by an[y] outstanding merchandise credit memorandum." Dkt. 117 at 16. Rather, Tempur-Sealy argues that Section 8 only applies to "New Sales" through Section 2 of the Letter Agreements. *Id.* As noted above, that interpretation is unreasonable. Thus, Section 8 allows Mattress Firm to offset payments for products "by any outstanding merchandise credit memorandum." Dkt. 111-1 at 4; Dkt. 111-2 at 4.

Section 5 of the Tempur MRA[2] provides in relevant part:

> Vendor may at any time apply and offset any and all amounts which are due and owing to Retailer against any financial obligations of Retailer to Vendor and Retailer may at any time apply and offset any and all amounts which are due and owing to Vendor against any financial obligations of Vendor to Retailer.

Dkt. 111-2 at 3–4. Because this section is incorporated into the Tempur Letter Agreement, Mattress Firm is entitled offset payments for products by "any financial obligations" owed to it by Tempur-Pedic. *Id.*

2. *Section 4 of the Letter Agreements*

Section 4 of the Letter Agreements provides that Tempur-Sealy "will provide any outstanding merchandise credit in cash, net of all outstanding accounts receivable from Mattress Firm" by a certain date.[3] Dkt. 111-3 at 4; Dkt. 111-4 at 4. Tempur-Sealy argues that "[b]ecause outstanding merchandise credit memorandum and the other credits specifically mentioned in Section 2 of the

---

[2]Section 5 of the Sealy MRA differs from the Tempur MRA, and Mattress Firm does not argue that the Sealy MRA's Section 5 entitles it to an offset. *Compare* Dkt. 111-1 at 3, *with* Dkt. 111-2 at 3–4.

[3]That date is June 2, 2017, under the Sealy Letter Agreement and May 3, 2017, under the Tempur Letter Agreement. Dkt. 111-3 at 4; Dkt. 111-4 at 4.

Letter Agreements only apply to New Sales, Section 4 of the Letter Agreements concerning the *timing* for the issuance of Merchandise Credits necessarily refers to those credits that Mattress Firm would be entitled to in connection with New Sales." Dkt. 117 at 16. But Section 2 is not limited to "New Sales"; Section 2 applies to "New Sales *and* [the] [L]etter [A]greements." *See supra* Section III.A.1; *see also* Dkt. 111-3 at 3 (emphasis added). Thus, under Tempur-Sealy's own interpretation, Section 4 refers to those credits that Mattress Firm would be entitled to under Section 8 of the MRAs, as made applicable through Section 2 of the Letter Agreements. Section 4 confirms that Mattress Firm may offset payments for products by "any outstanding merchandise credit." Dkt. 111-3 at 4; Dkt. 111-4 at 4.

   3.  *Section 3 of the Letter Agreements*

Tempur-Sealy argues that Section 3 illustrates that Mattress Firm released its claims. Dkt. 117 at 17. The court disagrees. Tempur-Sealy relies on the portion of Section 3 that states "Mattress Firm acknowledges that [Tempur-Sealy] will not be making any other subsidies, support payments or similar payments (either under this letter agreement or the MRA or the Program Agreement) other than as specifically referred to in the second sentence of Section 2 above." Dkt. 111-3 at 3; Dkt. 111-4 at 3–4. Tempur-Sealy seems to interpret that clause to mean that the only payments it is obligated to make are those referred to in the second sentence of Section 2. *See* Dkt. 117 at 17.

But under Tempur-Sealy's strained interpretation of Section 3, Mattress Firm would not be entitled to merchandise credits for "New Sales" because they are not "specifically referred to in the second sentence of Section 2." The parties agree that section 8 of the MRAs, incorporated by the *first sentence* in Section 2, provides Mattress Firm with the right to merchandise credits in connection with "New Sales." *See supra* Section III.A.I. Thus, the "subsidies, support payments[,]

or similar payments" referred to in Section 3 necessarily refer to payments other than those provided for in the first sentence of Section 2. Tempur-Sealy's Section 3 argument fails.

Accordingly, Mattress Firm did not release its right to offset as Tempur-Sealy argues. For that reason, Tempur-Sealy did not meet its initial burden for its request for summary judgment. *Shaw Constructors*, 395 F.3d at 538–39.

**B.     Offset Defense**

Mattress Firm's offset claim is a post-termination obligation under the Letter Agreements and thus was not released. *See supra* Section III.A. The court must enforce an unambiguous contract as written. *Grohman*, 318 S.W.3d at 887. Section 8 of the MRAs and Section 4 of the Letter Agreements unambiguously provide Mattress Firm with the right to offset any outstanding amounts owed to Tempur-Sealy with any outstanding merchandise credits. *See supra* Section III.A. Section 5 of the Tempur MRA unambiguously provides Mattress Firm with the right to offset any outstanding amounts owed to Tempur-Pedic with any financial obligations owed to it by Tempur-Pedic. *See supra* Section III.A.1. Because Mattress Firm has the right to offset as a matter of law, its motion for summary judgment is GRANTED.

### IV. CONCLUSION

Mattress Firm's motion for summary judgment (Dkt. 111) on its offset defense is GRANTED. Mattress Firm has the right to offset any outstanding amounts owed to Tempur-Sealy as set forth in this order. Tempur-Sealy's request for summary judgment (Dkt. 117) is DENIED because Mattress Firm did not release its right to offset.

Signed at Houston, Texas on July 23, 2018.

_____
Gray H. Miller
United States District Judge